UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA

                -v-

NKANGA NKANGA,

                *Defendant.*
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**18 Cr 713 (JMF)**

# BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR BAIL AND OTHER RELIEF

Respectfully submitted,

Daniel S. Parker
Parker and Carmody, LLP
850 Third Ave., 14th Floor
New York, NY 10022
DParker@ParkerandCarmody.com
Tel: (212) 239-9777

Joshua J. Horowitz
Horowitz Tech Law P.C.
350 Fifth Avenue, Suite 7610
New York, New York 10118
joshua.horowitz@techlawny.com

Attorneys for Defendant

Dated: March 26, 2020
      New York, N.Y.

**PARKER AND CARMODY, LLP**
**ATTORNEYS AT LAW**
**850 THIRD AVENUE**
**14TH FLOOR**
**NEW YORK, N.Y. 10022**

DANIEL S. PARKER                                                                                           TELEPHONE: (212) 239-9777
MICHAEL CARMODY                                                                                    FACSIMILE:  (212) 239-9175
CHRISTINA S. COOPER                                                                       DParker @ParkerandCarmody.com

March 26, 2020

**By ECF**
Hon. Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re: **United States v. NKANGA NKANGA**
**18 Cr 713 (JMF)**

Dear Judge Furman:

**I.  PRELIMINARY STATEMENT AND BRIEF PROCEDURAL HISTORY**

We write on behalf of Dr. Nkanga Nkanga ("the defendant" or "Dr. Nkanga"), seeking his immediate release on bail pending execution of sentence, or in the alternative, the specified alternative relief sought accomplishing same, due to the rapidly deteriorating circumstances in the MDC Brooklyn resulting from the rampant spread of COVID-19 in that facility and Dr. Nkanga's severely compromised and declining health.

On October 24, 2019, Dr. Nkanga was remanded to the custody of the BOP, under the mandatory remand provision of 18 USC § 3143(a)(2).  At the time, Dr. Nkanga consented to detention and did not argue the existence of "exceptional circumstances" under 18 USC §

1

3145(c) which would render detention inappropriate.

During the pendency of this case up until the date of his remand, Dr. Nkanga was at liberty on a $500,000.00 personal recognizance bond, secured by $10,000.00 cash. (Dkt. No. 9). The conditions of his release were later modified by the Court on June 18, 2019, permitting the return of the $10,000.00 to Dr. Nkanga so that he could cover necessary living expenses. (Dkt. No. 32). The Pre-Sentence Report ("PSR") in this case notes that, "While on supervision, the defendant remained compliant with all bail conditions," and that he has not had any disciplinary issues at MDC since being in custody. (PSR at ¶¶ 7-8, Dkt. No. 58).

On March 12, 2020, Dr. Nkanga was sentenced by Your Honor to a term of 36 months' imprisonment, with Judgment entered by the Court on that same date. Dr. Nkanga has not yet been designated and still remains in custody in MDC Brooklyn, necessitating, to the extent possible, an expedited resolution of the instant motion.

## II. THIS COURT HAS AUTHORITY TO RELEASE DR. NKANGA ON BAIL PENDING EXECUTION OF SENTENCE

Title 18 U.S.C. § 3141(b) provides that "A judicial officer of a court of original jurisdiction over an offense . . . shall order that, pending imposition **or execution of sentence,** . . . a person be released or detained under this chapter." (emphasis added). While sentence was imposed by the Court on March 12, 2020, that sentence has not yet been executed and thus this Court retains authority to order the release of Dr. Nkanga on bail pending execution of sentence.

Under 18 USC § 3585(a), "A sentence to a term of imprisonment commences on the date the defendant is received in custody awaiting transportation **to** . . . **the** official detention facility at which the sentence is to be served." (emphasis added). At the present time, Dr. Nkanga has not yet been designated by the BOP and remains in custody at the MDC in Brooklyn. (Parker

Decl. at ¶ 4).

The plain language of 18 USC § 3585(a) makes clear that Dr. Nkanga's sentence has not yet commenced or been executed, and thus this Court retains authority to order his release on bail pursuant to 18 USC § 3141(b).  "Interpretation of a statute must begin with the statute's language."  Mallard v. United States District Court, 490 U.S. 296, 300 (1989).  To ascertain the plain meaning of a provision, the court should look to the language of the provision in light of the statutory scheme as a whole.  Id. If the statutory terms are unambiguous, the inquiry generally ends there, and the statute is construed according to its plain meaning.  See United States v. Gayle, 342 F.3d 89, 92 (2d Cir. 2003); Greenery Rehabilitation Group, Inc. v. Hammon, 150 F.3d 225, 231 (2d Cir. 1998).

Applying the plain language of 18 USC § 3585(a), Dr. Nkanga is not "awaiting transportation **to**" anywhere, let alone, "**the official detention facility** at which the sentence is to be served."  (emphasis added).  Congress's use of the word "to" coupled with "the official detention facility" necessarily implies that there must be a specific destination to which a prisoner is awaiting transport for a sentence to commence under 18 USC § 3585(a).  Here, that is not the case.  Dr. Nkanga has not yet been designated and he is currently not awaiting transportation to anywhere. Moreover, approximately one week ago, the BOP suspended transportation of all inmates within the Bureau of Prison system for 30 days due to mounting concerns stemming from COVID-19.  (Parker Decl. at ¶¶ 4 -5).  Because he is not awaiting transportation to any destination, his sentence has not commenced.

To the extent that the Government argues that this interpretation is contrary to policy, we direct the Court to the Government's brief on appeal in Pope v. Perdue, 889 F.3d 410 (7th Cir., decided May 3, 2018) where the Government wrote:

3

> Specifically, § 3585(a) requires that an inmate be designated to a facility where he is to serve his sentence. Because that did not happen in Pope's case, his federal sentence did not commence until he was paroled by the state.
> (7th Circuit Case # 16-4217, Dkt. No. 35).

While the 7th Circuit ultimately held in Pope that the language of 18 USC § 3585(a) does not require BOP designation for the commencement of sentence, the 7th Circuit's opinion is not binding on this Court and it is devoid of any analysis of the plain language contained under § 3585(a). The 7th Circuit's opinion states in conclusory fashion that, "This argument fails as the language of the statute contains no such requirement. It requires that the inmate be awaiting transport to **a** detention facility, not the detention facility already assigned." 889 F.3d at 416 (emphasis added).

This analysis misstates the plain language contained under § 3585(a), which applies to a prisoner "awaiting transport **to** . . . **the** official detention center at which the sentence is to be served" (emphasis added). It is not awaiting transport to **any** official detention center, but rather a specific one, "**the** official detention center." Further, the 7th Circuit's holding in Pope is limited to a discrepancy in time-credit calculation where the defendant was serving time on both state and federal offenses and "bounced back and forth between state and federal facilities." Pope at 412.

By contrast to Pope, the Tenth Circuit held in Weekes v. Fleming, 301 F.3d 1175 (10th Cir. 2002) held that a defendant's federal sentence commenced on the specific date of designation, chosen by the United States Attorney General, by "designating a federal prison where he should serve and then transporting him to that facility." Id. at 1179.

We readily acknowledge that the BOP prison program statement, P.S. 5880.28, provides in relevant part that:

4

> If the prisoner is serving no other federal sentence at the time the sentence is imposed, and is in exclusive federal custody (not under the jurisdiction of a federal writ of habeas corpus ad prosequendum) at the time of sentencing on the basis of the conviction for which the sentence is imposed, the sentence commences on the date of imposition, even if a state sentence is running along concurrently.

However, the Tenth Circuit in <u>Weekes,</u> stated that, "[a] program statement is an internal agency guideline, which is akin to an interpretative rule. *See Reno v. Koray,* 515 U.S. 50, 61, 115 S. Ct. 2021, 132 L. Ed. 2d 46 (1995). Where the BOP's interpretation is a 'permissible construction of the statute,' it is entitled to 'some deferences.' *Id."* <u>Weekes</u> at FN 3. Significantly, the above program statement is contained under a heading titled "3. Computation of Sentence." The BOP program statement's interpretation of §3585(a) is therefore in the context of sentence computation, and is inapplicable to the issue at bar, which is, whether the Court retains authority to release Dr. Nkanga on bail where he has been sentenced but not designated.

Indeed, undersigned counsels' research has not identified any cases directly addressing the Court's authority to release a defendant on bail pending designation, where the defendant has already been sentenced and is remanded to custody. We submit that under the plain language of § 3585(a), Dr. Nkanga's sentence has not commenced, and that this Court therefore retains authority to release him on bail pending execution of sentence, pursuant to 18 USC § 3141(b).

### III. EXCEPTIONAL CIRCUMSTANCES NOW EXIST WARRANTING DR. NKANGA'S IMMEDIATE RELEASE ON BAIL

At the time of Dr. Nkanga's detention hearing on October 24, 2019, he did not raise the issue of "exceptional circumstances" and consented to remand pursuant to 18 USC § 3143(a), given the offense of conviction. Title18 USC § 3143(a)(2) applies to a person who is, "awaiting imposition **or execution** of sentence," (emphasis added). As detailed *supra* at Point II, sentence

has not yet been executed because he has not been designated.

Trial courts have the discretion to release a defendant who is subject to detention pursuant to § 3143(a)(2) if the following two factors are met: 1) the defendant meets the conditions of release set forth in § 3143(a)(1), i.e. that there is clear and convincing evidence that he does not pose a risk of either flight or danger to the community if released; and (2) it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate. United States v. Lippold, 175 F. Supp. 2d 537, 539 (S.D.N.Y. 2001, Sweet, J.) (citing 18 USC § 3145(c), other internal citations omitted).

Here, it is a certainty that Dr. Nkanga poses no risk of flight or danger to the community if released. He was out on bail during the pendency of this case without issue. (PSR at ¶ 7). He is a first-time offender who was not convicted of a violent offense and has not a shred of violence in his soul.

The issue for the Court's determination is whether Dr. Nkanga can make a clear showing of exceptional circumstances as to why his detention would not be appropriate. We submit that the rampant spread of COVID-19 inside of MDC Brooklyn coupled with Dr. Nkanga's age and medical conditions are more than sufficient, by any standard, to show that his detention would not be appropriate. We accordingly request that the Court release Dr. Nkanga on bail conditions pending execution of his sentence, and permitting him to self-surrender to his designated BOP facility no later than June 26, 2020.

### A.  The Spread of COVID-19 in MDC Brooklyn Presents 'Exceptional Circumstances' for Dr. Nkanga

New York City is facing a serious and urgent public health crisis.[1] On March 11, 2020, the World Health Organization officially classified COVID-19, the respiratory illness caused by a novel strain of coronavirus, as a global pandemic.[2] On January 21, 2020, Washington State announced the first confirmed case in the United States.[3] Only two months later, COVID-19 has infected over 41,701 people across the United States, leading to at least 537 deaths.[4]

Infections are increasing at an exponential rate. The first case of coronavirus in New York State was announced on March 1, 2020. Less than two weeks later, New York State reported 325 positive cases. To date, the state has amassed 20,878 confirmed cases of the virus, with 157 deaths.[5] In a five-day period between March 15 and March 20, New York State experienced a ten-fold increase in new confirmed cases of COVID-19.[6] As of March 23, 2020 in New York City, there are 13,115 positive cases and 125 deaths resulting from the virus.[7] Most cases are in men in their 30s and 40s. Id. New York City is an epicenter of the pandemic.[8]

---

[1] We gratefully acknowledge the fact that the research for this section, which applies generally to federal inmates, was conducted by gifted colleagues at the Federal Defenders of New York.
[2] WHO Characterizes COVID-19 as a Pandemic, World Health Organization (Mar. 11, 2020), at https://bit.ly/2W8dwpS.
[3] First Patient With Wuhan Coronavirus Is Identified in the U.S., The New York Times (Jan. 21, 2020), at https://www.nytimes.com/2020/01/21/health/cdc-coronavirus.html.
[4] See Coronavirus Map: Tracking the Spread of the Outbreak, The New York Times (March 23, 2020), at https://nyti.ms/2t6WE75 (updating regularly).
[5] Id.
[6] Watch How the Coronavirus Spread Across the United States, The New York Times (Mar. 21, 2020), at https://www.nytimes.com/interactive/2020/03/21/us/coronavirus-us-cases-spread.html.
[7] Coronavirus, New York City Health (Mar. 23, 2020), at https://on.nyc.gov/39ME7wU (updating regularly).
[8] Coronavirus in N.Y.C.: Region Is Now an Epicenter of the Pandemic, The New York Times (Mar. 23, 2020), at https://www.nytimes.com/2020/03/22/nyregion/Coronavirus-new-York-epicenter.html?action=click&module=Spotlight&pgtype=Homepage.

In response to this public health crisis, Gov. Andrew Cuomo declared a State of Emergency in New York State on March 7, 2020.[9] New York City Mayor Bill de Blasio declared a State of Emergency in New York City on March 12, 2020, banning gatherings of more than 500 people.[10] On March 20, 2020, Governor Cuomo directed all non-essential workers to work from home, requiring individuals to maintain six feet of distance between each other.[11] The same day, the Federal Emergency Management Agency (FEMA) declared New York "a major disaster."[12]

According to the Centers for Disease Control and Prevention (CDC), nearly 40% of patients hospitalized from coronavirus were 20 to 54 years old.[13] In New York, 18- to 49-year-olds comprise more than half of all cases in the state. In New York City, 57% of patients are male.[14] With thousands of confirmed cases in New York City that indicate community spread, we must take every necessary action to protect vulnerable populations and the community at large.

### 1. Conditions of pretrial confinement create the ideal environment for the transmission of coronavirus.

"Prisons are petri dishes for contagious respiratory illnesses."[15] Inmates cycle in and out of Bureau of Prisons (BOP) -pre-trial facilities from all over the world and the country, and

---

[9] At Novel Coronavirus Briefing, Governor Cuomo Declares State of Emergency to Contain Spread of Virus, New York State (Mar. 11, 2020) *at* https://on.ny.gov/2TKzIoz.
[10] DeBlasio Declares State of Emergency in NYC, and Large Gatherings Are Banned, The New York Times (Mar. 12, 2020).
[11] Novel Coronavirus (COVID-19), New York State Department of Health (Mar. 21, 2020), at https://on.ny.gov/2vfFQvy (updating regularly).
[12] President Donald J. Trump Approves Major Disaster Declaration for New York, FEMA (Mar. 20, 2020), at https://www.fema.gov/news-release/2020/03/20/president-donald-j-trump-approves-major-disaster-declaration-new-york.
[13] Younger Adults Make Up Big Portion of Coronavirus Hospitalizations in U.S., The New York Times (Mar. 20, 2020), at https://www.nytimes.com/2020/03/18/health/coronavirus-young-people.html.
[14] See NYC Dept' of Health Daily Data, March 23, 2020, available at https://www1.nyc.gov/assets/doh/downloads/pdf/imm/covid-19-daily-data-summary.pdf.
[15] Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons, Los Angeles Times (Mar.

people who work in the facilities leave and return daily, without screening or testing. On March 21, 2020, an inmate at Metropolitan Detention Center (MDC) tested positive for the coronavirus.[16] The individual "complained of chest pains on Thursday, a few days after he arrived at the facility."[17] When he first arrived at the facility, according to authorities, he was asymptomatic. The effect on the population at MDC remains to be seen, but as the chief physician at Rikers Island publicly cautioned, "[a] storm is coming."[18]

Given what we know about COVID-19, the BOP's quest to contain the infection seems futile. Coronavirus is highly contagious. On average, one person with the coronavirus will infect between two to three other individuals.[19] But public health experts agree that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[20]

Internationally, prisons have spawned rapid spread of COVID-19. In China, officials confirmed 500 cases in prisons.[21] Courts across Iran have granted 54,000 inmates furlough as

---

20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration. See also Joseph A. Bick (2007). Infection Control in Jails and Prisons. Clinical Infectious Diseases 45(8):1047-1055, at https://doi.org/10.1086/521910.

[16] See 1st fed inmate tests positive for coronavirus, A.P. News (Mar. 21, 2020), at https://apnews.com/ec49cc7f4d1b00bc5010dfb6d935e042.

[17] Id.

[18] 'A Storm Is Coming': Fears of an Inmate Epidemic as the Virus Spreads in the Jails, The New York Times (Mar. 21, 2020), at https://www.nytimes.com/2020/03/20/nyregion/nyc-coronavirus-rikers-island.html.

[19] The average coronavirus patient infects at least 2 others, suggesting the virus is far more contagious than flu, Business Insider (Mar. 17, 2020), at https://www.businessinsider.com/coronavirus-contagious-r-naught-average-patient-spread-2020-3.

[20] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), at https://bit.ly/2W9V6oS.

[21] Rhea Mahbubani, Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials, Business Insider (Feb. 21, 2020), at https://bit.ly/2vSzSRT.

part of the measures to contain coronavirus across the country.[22] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[23]

On March 20, 2020, the New York City Department of Correction announced that one inmate and seven staff members in the city jails had been diagnosed with coronavirus.[24] One day later, on March 21, 2020, it became clear that no fewer than 38 people tested positive.[25] At least 58 additional people are being held in contagious disease and quarantine units in the city's jail system.[26] But the cases are not abating. The chairwoman of the New York City Board of Correction urged, "The best path forward to protecting the community of people housed and working in the jails is to rapidly decrease the number of people housed and working in them."[27] The New York City Bar Association has called on "all actors in the criminal justice system" to "swiftly move to reduce the density at all New York City area jails and prisons to prevent or slow the spread of the virus." [28]

Just this afternoon, Attorney General William Barr reportedly said during a DOJ press conference conducted via teleconference, "You want to make sure that our institutions don't become petri dishes and it spreads rapidly through a particular institution . . . [b]ut we have the

---

[22] Claudia Lauer and Colleen Long, US Prisons, Jails On Alert for Spread of Coronavirus, The Associated Press (Mar. 7, 2020), at https://apnews.com/af98b0a38aaabedbcb059092db356697.
[23] Jennifer Hansler and Kylie Atwood, Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak, CNN (Mar. 10, 2020), at   https://cnn.it/2W4OpV7.
[24] 38 positive for coronavirus in NYC jails, including Rikers, ABC News (Mar. 21, 2020), at https://abcnews.go.com/US/wireStory/38-positive-coronavirus-nyc-jails-including-rikers-69731911.
[25] Id.
[26] Id.
[27] Id.
[28] See Statement of the New York City Bar Association Urging Immediate Steps to Reduce Prison and Jail Populations to Prevent Spread of the Covid-19 Virus at 2-3, available at https://s3.amazonaws.com/documents.nycbar.org/files/COVID_Prisons_Jails_Statement_FINAL.pdf.

protocols that are designed to stop it and we are using all the tools we have to protect the inmates." He added that "one of those tools will be identifying vulnerable prisoners who would make more sense to allow to go home to finish their confinement."[29]

Dr. Nkanga is precisely the prototype of the vulnerable inmate who should be granted bail: he is 67 years old and suffers from a plethora of medical conditions – including asthma, has recently suffered from a respiratory illness while at the MDC, has no prior criminal history, and has never engaged in violent acts. For him, the Court's decision on this application could mean the difference between life and death.

### 2. The MDC remains unprepared for a coronavirus outbreak

Inmates at the MDC -- a massive pretrial detention facility housing approximately 1700 people -- are at grave risk of contracting the virus.[30] The medical care at the MDC has repeatedly failed to adequately address even routine medical conditions

On March 13, 2020, nearly two weeks after the first confirmed case of coronavirus in New York State, the Bureau of Prisons announced a 30-day suspension of all visits to all federal correctional facilities. But prohibiting visits to correctional facilities is insufficient to stop the spread of illness. "[T]here is no way to stop the daily flow of guards, teachers, food service and healthcare workers. Someone is certain to bring the virus in and take it back out while they are asymptomatic."[31]

---

[29] AG William Barr pushes expansion of home confinement to reduce prison populations amid coronavirus, ABC News (March 26, 2020), at https://abcnews.go.com/Politics/ag-william-barr-pushes-expansion-home-confinement-reduce/story?id=69816504

[30] See U.S. v. Shakeil Chandler, 19 Cr. 867 (PAC) ECF No. 16 at 12-22 (S.D.N.Y. March 23, 2020): Affidavit of Jonathan Giftos, M.D. (hereinafter "Giftos Affidavit").
[31] Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

To prevent new infections, the CDC strongly recommends (1) thorough and frequent handwashing, (2) cleaning surfaces with Environmental Protection Agency approved disinfectants, (3) keeping at least six feet of space between people, and (4) social distancing.[32]

To date, the MDC has not met the most basic recommendations of the CDC for preventing the spread of coronavirus. Maintaining six feet of distance from other inmates is all but impossible in a correctional facility where most individuals, including Mr. Rosario, are double-bunked in a single cell, sharing a toilet and sink with a cellmate and a common shower with at least sixteen other people. See generally, Exhibit A, Affidavit of Dr. Jonathan Giftos, at ¶¶ 14-16 (describing conditions at MDC that exacerbate the spread of contagion).

In addition to unhygienic living conditions, frequent movement between units at the MDC over the past several weeks will spread the virus. In New York City jails, where there have been at least 38 confirmed cases of coronavirus, the Board of Correction chairwoman stated, "[i]t is likely that these people have been in hundreds of housing areas and common areas over recent weeks and have been in close contact with many other people in custody and staff."[33] The MDC will encounter the same obstacle to cabining the spread.

The MDC's solution to curtailing all visits for 30 days -- providing additional phone minutes at no charge -- creates yet another public health hurdle. The MDC has given each inmate an additional 200 phone minutes, bringing the total to 500 minutes. But with the extra phone time comes swarms of crowds. The phones in Dr. Nkanga's unit remain in constant use and are inadequately cleaned, creating more opportunity to spread infection.

With each additional arrest comes increased risk of spreading the virus in MDC.

---

[32] See Giftos Affidavit.
[33] 38 positive for coronavirus in NYC jails, including Rikers, ABC News (Mar. 21, 2020), at https://abcnews.go.com/US/wireStory/38-positive-coronavirus-nyc-jails-including-rikers-69731911.

Individuals who are newly arrested and potentially exposed to coronavirus, if they are not symptomatic, will be brought into the facility. There, they are held with the existing population, potentially transmitting COVID-19 to a populace held in close quarters with unsanitary conditions. These conditions are ripe for the spread of infection: The individual who tested positive for coronavirus at the MDC on March 21 first was incarcerated only a few short days before becoming symptomatic.[34]

### 3. The federal judiciary has begun to set bail conditions for previously detained individuals in light of the coronavirus.

The judiciary has recently begun to recognize and address this crisis. On March 12, 2020, Magistrate Judge Orenstein denied a remand application, holding that increasing the population of the Metropolitan Detention Center could present a "danger to the community" -- the staff and inmates inside the jail—by potentially bringing the virus into the facility. See United States v. Raihan, 20-CR-68 (BMC) (Mar. 12, 2020). A week later, conditions worsened exponentially.

On March 19, 2020, thirteen days after having remanded defendant Dante Stephens, Judge Alison J. Nathan reversed a prior bail decision "in light of circumstances that have changed since the March 6 hearing," namely, "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic." U.S. v. Stephens, 15-CR-95 (AJN) (Mar. 19, 2020). In setting bail, Judge Nathan noted that "[a] comprehensive view of the danger the Defendant poses to the community requires considering all factors," including COVID-19. Id. Similarly, on March 19, 2020, the threat of coronavirus led Judge Ramos to release a formerly detained individual on bail. See U.S. v. Santiago Ramos, 20-CR-04 (ER).

---

[34] See 1st fed inmate tests positive for coronavirus, A.P. News (Mar. 21, 2020), at https://apnews.com/ec49cc7f4d1b00bc5010dfb6d935e042.

In the throes of this public health crisis, the Court should release Dr. Nkanga to protect his physical health.

### 4. Coupled with the Rampant Spread of COVID-19, Dr. Nkanga's Age and Medical Conditions Pose an Extreme Threat to his Life While Incarcerated at MDC Brooklyn

Dr. Nkanga is 67 years old. According to the CDC, 80 percent of deaths reported in the United States from COVID-19 cases have been in adults 65 years and older.[35] Due to his age alone, Dr. Nkanga is at severely heightened risk of death if he were to contract COVID-19. For the reasons set forth above, his mere presence in the MDC puts him at grave risk of contracting the virus, given its contagious nature.

While he has been incarcerated at the MDC, he was sick and suffering from a respiratory condition that left him short of breath. (Parker Decl. at ¶ 10). At one point, his condition was severe enough that his girlfriend asked undersigned counsel to cancel a scheduled meeting with him due to his respiratory condition. (Id. at ¶ 12). Dr. Nkanga also suffers from asthma, and relied on a portable inhaler while living at home.[36] (Id. at ¶ 6). In addition to age, asthma is a significant risk factor that the CDC has identified which could lead to a heightened risk of severe complications resulting from a COVID-19 infection.[37]

---

[35] Older Adults, available at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications/older-adults.html

[36] The Government advised counsel today that the BOP has no record of Dr. Nkanga being diagnosed with asthma. Since his incarceration, Dr. Nkanga repeatedly requested medical treatment and repeatedly complained to counsel about the BOP's failed responses to his requests. We have no confidence in the BOP's medical responsiveness and further, do not doubt that Dr. Nkanga focused more on his requests caused by a respiratory illness than his pre-existing asthmatic condition.

[37] People with Asthma and COVID-19, available at: https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/asthma.html ("People with asthma may be at higher risk of getting very sick from COVID-19. COVID-19 can affect your respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease.")

In the present environment, given Dr. Nkanga's age and medical history, his continued detention at the MDC Brooklyn poses a grave risk to his life. Accordingly, we request that the Court release Dr. Nkanga on the same bail conditions, as modified by the Court's order entered June 18, 2019 (Dkt. No. 32), and permit him to self-surrender to his designated BOP Detention facility no later than June 26, 2020.

## IV. DR. NKANGA MOVES PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE RULE 35(a) TO CORRECT DR. NKANGA'S SENTENCE BASED ON CLEAR ERROR

In the alternative to the above bail application, Dr. Nkanga respectfully moves this Court pursuant to Federal Rule of Criminal Procedure Rule 35(a) to correct Dr. Nkanga's sentence based on clear error – namely that the Court was not aware of, and could not be aware at the time of sentencing – the threat of the COVID-19 virus and its life-threatening effect on Dr. Nkanga.

Rule 35(a) of the Federal Rules of Criminal Procedure provides that, "[w]ithin 14 days after sentencing, the court may correct a sentence that resulted from arithmetical, technical, or other clear error."

We submit, most respectfully, that the Court failed to consider the applicable Grounds for Departure Policy Statement adopted under USSG § 5K2.0 (2)(B), which provides for departures based on circumstances of a kind not adequately taken into consideration, specifically unidentified circumstances. "A departure may be warranted in the exceptional case in which there is a present circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence."

Undoubtedly, the rampant spread of COVID-19 around the world and particularly within BOP federal correctional facilities was not contemplated by the federal sentencing guidelines. However, it was a factor that the Court was required to consider when imposing sentence on

15

March 12, 2020. Under 18 USC § 3553(a)(5), the Court was required to take into consideration, "any pertinent policy statement . . . in effect on the date the defendant is sentenced." While it is true that under Application Note 3 to USSG § 5K2.0, such departures based on unidentified circumstances "will occur rarely and only in exceptional cases" we submit that the present worldwide pandemic is indeed an exceptional case.

While the Court could not have known at the time of sentencing that MDC Brooklyn would have confirmed cases of COVID-19 (which indeed had not yet occurred), the day before sentence was imposed, on March 11, 2020 the WHO declared the rapidly spreading outbreak of COVID-19 a pandemic; and one week prior Governor Cuomo declared a State of Emergency in New York on March 7, 2020. (Giftos Decl. at ¶¶ 5, 7). Because the Court was required to consider the pertinent policy statement under the sentencing guidelines relating to departures based on unidentified circumstances, U.S.S.G. § 5K2.0 (a)(2)(B), but did not consider it in imposing sentence, we respectfully ask that the Court correct this clear error by vacating the sentence imposed and scheduling this matter for resentencing at a future date, while in the interim releasing Dr. Nkanga on bail conditions previously set forth on June 18, 2019 (Dkt. No. 32).

**V.     DR. NKANGA MOVES PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE RULE 33(a) TO VACATE THE JUDGMENT IN THE INTERESTS OF JUSTICE AND GRANT A NEW TRIAL AND RELEASE DR. NKANGA ON BAIL PENDING THE NEW TRIAL**

As an alternative to the above, Dr. Nkanga moves pursuant to Rule 33(a) to vacate the Judgment in this case in the interest of justice. For the reasons detailed above, Dr. Nkanga's continued detention in the MDC Brooklyn poses a grave risk to his continued survival, given his age and medical conditions. Should the Court grant this application, we respectfully request that

Dr. Nkanga be released on bail conditions previously set forth on June 18, 2019 (Dkt. No. 32).

## VI.   CONCLUSION

For the reasons detailed in this application, Dr. Nkanga's continued detention in the MDC Brooklyn poses a grave risk to his continued survival, given his age and medical conditions.  Accordingly, we respectfully request that the Court grant some form of the relief sought herein, or such other and further relief as this Court deems just and proper under the extraordinary circumstances.

We thank the Court for its immediate attention to this matter.

Very truly yours,

/s/

Daniel S. Parker
Joshua J. Horowitz

*Attorneys for Nkanga Nkanga*

cc:   All counsel (via ECF and Email)
   David Patton, Federal Defenders (via Email)